T.C. Memo. 2013-207

UNITED STATES TAX COURT

JAMES R. DIXON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

SHARON C. DIXON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9962-05L, 9965-05L.　　　　Filed September 3, 2013.

<u>Juan F. Vasquez, Jr.</u>, and <u>Renesha N. Fountain</u>, for petitioners.

<u>W. Lance Stodghill</u> and <u>Derek B. Matta</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  The Code imposes an obligation on employers to

withhold a portion of the wages that they pay to employees.  It gives taxpayers a

[*2] credit against their income tax for the amount of money withheld--even if their employer never pays that money to the IRS. The Dixons say they should get the credit because Tryco withheld $602,119 from their wages in 1992-95. But Tryco's payroll records are long gone, and the Commissioner says the Dixons can't have the credit because they haven't shown that Tryco withheld anything.

FINDINGS OF FACT

Sharon Dixon was startled when the IRS seized her bank accounts. She knew that she and her husband had tax troubles, but thought all their personal income-tax problems were in the past after they borrowed a half-million dollars against their home and sent it to the government. But instead of sending the cash directly to the IRS, the Dixons sent their money on a detour through a corporation which they owned. They had the corporation report to the IRS that the money should be credited as additional withholding on income the Dixons had earned years before.

The Dixons' corporation was Tryco, and they had founded it in 1990. Tryco was in the temp business in both the Houston and Dallas metropolitan areas, and its job was to round up workers for major newspapers, grocery chains, and department stores. For as long as Tryco was in business, James was its CEO and Sharon was its president. Tryco was a great success at first and at its peak provided thousands

[*3] of temporary employees each year. On the advice of their financial adviser the Dixons drew regular salaries and then distributed variable amounts to themselves as bonuses. They also occasionally took loans from the company, including nearly $450,000 that they borrowed from Tryco to pay for their house.

Their salaries were paid from a standard payroll account, and they had the usual income tax withheld from their checks in the same way as millions of other Americans have had done to them for decades. But their bonuses were another matter--those checks were written on a general-fund account by hand. According to James, the bonus checks consisted of net pay after Sharon reviewed IRS tax schedules and calculated how much tax should be withheld. They used this more cumbersome system to maintain privacy; the Dixons didn't want other people in the company knowing how successful Tryco was and how much they were paying themselves in bonuses. The general manager that they hired after Tryco's business started booming--and that manager's wife, who also worked at Tryco--were the only other people who knew about these bonuses.

The Dixons' tax problems began late in 1992. Tryco stopped filing its quarterly tax returns in the fourth quarter of that year, and then made nonfiling a bad habit--the company failed to file returns and failed to pay over to the IRS either withheld employee income taxes or employment taxes for the fourth quarter of

**[*4]** 1992 through 1995. The Dixons blame their general manager--whom they had put in charge of the company's fiscal affairs to free themselves up to focus on sales--for this default. But we have to note that the Dixons themselves also failed to file returns or pay their individual income taxes during much of this time.

Although they weren't filing their returns, the Dixons credibly testified--and we therefore find--that they weren't aware until 1997 that Tryco wasn't filing returns or making payments either. They discovered this when both were criminally prosecuted for failure to file their individual income-tax returns. They hired Larry Campagna, a senior and very reputable Texas tax attorney, to represent James in his criminal-tax case and to take the lead in planning their defense. (Sharon was represented by another attorney.) Campagna had over twenty years of experience in tax and tax controversy and had handled hundreds of cases dealing with withholding taxes, and we find that the Dixons were certainly justified in looking to him and his firm for advice and assistance.

Campagna hired an accounting firm to help review Tryco's records and figure out, among other things, how much money had actually been withheld from the Dixons' paychecks. It was this review that revealed Tryco's failure to remit any withheld taxes. The Dixons then turned the records over to the government so that an agreement could be reached in the criminal-tax cases. By 1999 both sides

[*5] in the criminal cases agreed that Tryco had withheld the following amounts[1] from the Dixons' salary and bonus checks,[2] even though the corporation hadn't actually paid over the withheld amounts:

| Year | Sharon | James |
|------|--------|-------|
| 1992 | $13,032.69 | $13,032.69 |
| 1993 | 49,778.70 | 49,778.71 |
| 1994 | 123,013.06 | 123,013.06 |
| 1995 | 69,623.23 | 69,623.24 |
| Total | 255,447.68 | 255,447.70 |

District courts use tax losses to calculate the appropriate sentence under federal sentencing guidelines. So this agreement on the amounts Tryco had

---

[1] Because the Dixons reside in a community-property state, they are each entitled to claim one-half of James's withholdings and one-half of Sharon's withholdings. See sec. 1.31-1(a), Income Tax Regs. (Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years at issue; and all Rule references are to the Tax Court Rules of Practice and Procedure.)

[2] As we explain in more detail below, employers must generally deduct and withhold payroll taxes--including income tax, Social Security tax, and Medicare tax--from their employees' paychecks. The income tax withheld is a credit against the income tax owed by the taxpayer. The Social Security and Medicare taxes have two portions--one paid by the employer and one paid by the employee; the employer pays its portion and withholds the employee's. Employers must file Form 941, Employer's Quarterly Federal Tax Return, to report those taxes. If they fail to file Form 941 or pay over the taxes on time, they are subject to penalties (unless they get an extension and pay the associated fee), and interest accrues on the unpaid balance.

**[\*6]** withheld helped the Dixons when it came time to compute that loss, leading to an agreement between them and their prosecutors that the government had suffered a criminal-tax loss of $30,799.29 from Sharon and $30,222.49 from James. And the conclusion of the Dixons' accountant and lawyer and the assistant U.S. attorney working the case that the Dixons' withholding exceeded (or nearly equaled) their tax liability for 1992-1994 led to a plea deal for failure to file only for the 1995 tax year. Courts typically order criminal-tax defendants to pay restitution as part of their sentences, and the Dixons borrowed almost a half-million dollars in 1999 against the equity in their house (they were able to do so because Tryco had never put a lien on it for the money that the Dixons had borrowed from the company to buy it in the first place), contributed that money to Tryco, and had Tryco pay it over to the IRS as "payment of [Form] 941 taxes of the corporation * * * to be applied to the withheld income taxes" of James and Sharon for each quarter of the 1992 through 1995 tax years. Their intent was clear--as Campagna testified, "Mr. and Mrs. Dixon borrowed the money and contributed it to the corporation." In a motion seeking a sentence of probation, they called these payments "extraordinary restitution," though the actual criminal judgments did not.

The total amount that Tryco paid equalled what the Dixons and the prosecutors agreed had actually been withheld from their paychecks (but that Tryco

**[\*7]** had not paid over at the time), plus the entire amount of the statutorily calculated tax loss. The capital contribution to Tryco was necessary because the corporation--though in existence--was no longer doing much business. Everything was done this way--and not simply with the Dixons' paying their full tax liability directly--because Campagna recommended it; if they hadn't, Campagna thought, Tryco would still have been liable for the withholding taxes and Campagna didn't want to have the tax paid twice:

> had Mr. and Mrs. Dixon remitted the income taxes directly for their account, then the 941 liability for Tryco would not have been reduced by the payment, and the Government would have been asking for a double collection of the same money on the income tax side and the employment tax side.

In the first half of 2000, the accountants prepared Forms 1040 for the Dixons' missing tax years. They figured out that the Dixons owed $30,202 more in taxes than what had already been paid via the Dixons' first capital-contribution-followed-by-Tryco's-payment exercise the previous year. The Dixons decided to send more money to Tryco, and in June 2000 Tryco again paid the money over to the IRS and designated it as payment of withheld taxes for the Dixons.[3] (It also asked the IRS to reallocate some of the funds from the first payment to different

---

[3] We discuss the effect of this later payment and designation in the other Opinion in these cases which we file today. See Dixon v. Commissioner, 141 T.C. __ (Sept. 3, 2013).

[*8] quarters.) All this was to make the taxes paid through Tryco for each of the

Dixons match their actual tax liability for each of the years in question.

The accountants prepared Forms W-2c, Corrected Wage and Tax Statement,

for the Dixons as well as Forms 1040 reflecting these adjusted withholding

amounts as follows (we've rounded to the nearest dollar):

|  | 1992 | | 1993 | | 1994 | | 1995 | |
|---|---|---|---|---|---|---|---|---|
|  | James | Sharon | James | Sharon | James | Sharon | James | Sharon |
| Tryco | $16,601 | $16,779 | $25,766 | $19,469 | $30,867 | $23,627 | $36,214 | $35,412 |
| 11/99 payment | 1,110 | 1,258 | 31,755 | 39,902 | 68,404 | 70,078 | 87,779 | 66,895 |
| 05/00 payment | n/a | n/a | n/a | n/a | n/a | n/a | 15,101 | 15,101 |
| Tryco bonus | n/a | n/a | -0- | -0- | -0- | -0- | -0- | -0- |
| Dixco bonus[1] | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- |
| Allocation from spouse | 7,856 | 8,026 | 30,016 | 29,091 | 63,818 | 66,601 | 52,566 | 63,409 |
| Allocation to spouse | -8,026 | -7,856 | -29,091 | -30,016 | -66,601 | -63,818 | -63,409 | -52,566 |
| Total | 17,541 | 18,207 | 58,446 | 58,446 | 96,488 | 96,488 | 128,251 | 128,251 |

[1] Dixco was another corporation that the Dixons owned and operated during this time. We include Dixco here because the accountants included it on the Forms 1040.

This was all done separately from the criminal proceedings, which had been

resolved by plea agreements in which each of the Dixons pleaded guilty to one

count of misdemeanor failure to file a 1995 return. Campagna petitioned the court

[*9] for a downward departure from the sentencing guidelines based on several factors, including the Dixons' willingness to contribute money to Tryco to ensure that their income taxes were paid, even though "the bulk of Mr. Dixon's taxes would have been deemed paid when withheld." The Court denied the motion, and the Dixons were sentenced to four years of probation with six months of house arrest. The plea agreements clearly indicated that the resolution of the criminal cases did not relieve the Dixons of their civil tax liability. The Dixons, however, thought that by filing their individual tax returns and directing Tryco to pay withholding taxes specifically for their account, they had taken care of their individual income-tax problem and made at least a small payment toward Tryco's enormous remaining employment and withholding-tax liability of nearly $23 million.

The Commissioner disagreed. He sent the Dixons a notice of intent to levy. The notice stated that the couple owed more than $800,000 in unpaid taxes, penalties, and interest for the 1992-95, 2000, and 2002 tax years. The Dixons asked for a collection due process (CDP) hearing[4] and were very surprised when

---

[4] A taxpayer who gets a lien or levy notice from the IRS can request a CDP hearing with the IRS Office of Appeals. See secs. 6320, 6330. The Appeals officer will then hold a conference with the taxpayer and determine whether to proceed with collection. See sec. 6330(c).

[*10] their bank informed them that Sharon's accounts had already been levied upon. The Appeals officer who contacted the Dixons to let them know that he had received their CDP request told them that the levy on Sharon's account was to collect unpaid 1992-95 taxes that were the subject of the hearing. This was irregular, but they got all that straightened out.

The Dixons then had their CDP hearing, and the Appeals officer at first agreed that they no longer owed tax for 1992-95. For a short time, the IRS recorded Tryco's payments as the Dixons intended: For James's 1993 tax year, for example, the IRS credited more than $58,000 as a withholding credit, and the more than $62,000 in interest between the date of the credit and the return's original due date of April 15, 1994, was abated.[5] But then others at the Appeals Office began questioning the effect of Tryco's designation in 1999 of its payment for the Dixons' 1992-95 tax bill. After several exchanges, the Commissioner finally issued new notices of determination in which he upheld the levy in full for

---

[5] We discuss it more in the other Opinion in this case that we are also filing today, but it is useful to highlight that the Code treats any amount for which a taxpayer is credited under section 31 as paid on the original due date of the return, not when it is actually made. See sec. 31(a)(2). Thus, the effect of the Dixons' position is that Tryco's late payment of the withholding tax would not only satisfy their tax debt, but also cancel the portion of that debt that consisted of compounded interest. Campagna testified that "I don't think that I was concerned about the interest." We are not so sure, but need make no finding on this point.

[*11] all six of the tax years at issue. The Appeals officer reasoned that the Dixons could be credited only with the withholding that Tryco had noted on their original W-2 Forms that the Dixons had attached to their 1993 and 1994 tax returns. "Forms W-2 were not submitted with the 1992 and 1995 income tax returns * * *; therefore the withholding claimed on these returns will not be allowed." She disallowed the extra withholding on the Dixons' Forms W-2c because "the payments were not withheld at the source and, * * * cannot be designated to the withholding of a specific employee." She noted the absence of any additional payroll records that might have supported the Dixons' claims to additional withholding, and adopted the report of the IRS Examination Division that "due to the unavailability of complete actual payroll records maintained by Tryco, the Service computed the income tax withholding as a standard percentage of total wages paid during each quarterly period, as provided in Treasury Regulation 31.3402(g)-1(a)(2)(ii)." The Dixons later waived their challenge to the IRS's collection of their 2000 and 2002 tax debts, and only 1992-95 remain at issue.

The Dixons lived in Texas when they filed their petitions. We consolidated the cases and tried them in Houston.

[*12]                    OPINION

I.    Jurisdiction

Because these cases arise out of a notice of determination from a CDP hearing, it is clear that we have jurisdiction to review the Appeals officer's determination.  Sec. 6330(d)(1).

The Dixons claim that they are entitled to a credit under section 31 because Tryco actually withheld $602,119 from their wages in 1992-95.  Tryco's withholding obligations aren't before us here--the Dixons' income taxes are.  But because section 31 allows taxpayers to claim as a credit on their tax returns the money that was withheld by employers, we need to figure out whether and how much Tryco withheld from the Dixons' paychecks.  That means that we need to look to certain facts arising from Tryco's withholding taxes.  Looking to years or taxes over which we do not have jurisdiction to make a determination about a year and tax over which we do have jurisdiction is, however, nothing new.  It is the same thing we do when we consider an overpayment in another year as part of a deficiency proceeding, or when we find certain facts for one year because they affect another year.  See sec. 6214(b); Freije v. Commissioner, 125 T.C. 14, 25-26 (2005).

**[\*13]** II.     Standard of review

Section 6330(c)(2)(B) allows a taxpayer to challenge the existence or amount of his underlying tax liability at a CDP hearing if he neither received a notice of deficiency nor had a prior opportunity to dispute it.  The underlying tax liability is "the amount unpaid after application of credits to which petitioner is entitled."  See Landry v. Commissioner, 116 T.C. 60, 62 (2001).  The Dixons didn't receive a notice of deficiency and didn't have a chance to dispute their tax liability before their CDP hearing, so they were right to raise it at their CDP hearing.  We review determinations about the underlying liability *de novo*.  See Sego v. Commissioner, 114 T.C. 604, 609-10 (2000).

III.     Actual withholding

A.     How withholding usually works

Under section 3402, an employer must withhold estimated income tax from its employees' wages throughout the year and pay it directly to the government. The government gets the money it's due while taxpayers don't have to come up with large sums of money all at once.  An employee usually tells his employer on a Form W-4 how many exemptions he anticipates, and the employer uses that information to withhold a specific amount from each paycheck.  The employer then remits the withheld funds for all its employees to the government on a

**[*14]** quarterly basis by filing a Form 941. <u>See generally</u> IRS Publication 15 (Circular E), Employer's Tax Guide.

At the end of the year, the employer reviews its records and determines how much of the withheld money is attributable to each individual employee. It then reports this information to the employees on separate Forms W-2 and to the IRS through a combined Form W-3, Transmittal of Wage and Tax Statements. If the employer makes a reporting mistake, it can issue a Form W-2c, which alerts the employee and the IRS and reports the correct information. <u>See</u> IRS General Instructions for Forms W-2 and W-3, at 4-5 (2012).[6]

The employee uses the W-2 (or the W-2c) as evidence of how much money was withheld from his income and subtracts that amount as a credit against his overall tax liability. Sec. 31(a). As far as the employee is concerned, it doesn't matter whether or not the employer actually fulfilled its duty to turn over the withheld money to the government; that's between the government and the employer. <u>See</u> sec. 1.31-1(a), Income Tax Regs. This rule makes sense--most employees have no control over what their employer does with the money that it is supposed to hold in trust and pay to the government.

---

[6] We have no reason to think that the absence from the record of instructions for these forms for the years at issue would change this general background.

**[\*15]** B.     <u>What happened here</u>

The tangle in these cases began when neither the Dixons nor Tryco filed timely tax returns for the years at issue.  This caused confusion about how much withholding there actually was.  Things got more complicated by Tryco's records' getting lost somewhere between the criminal cases and the CDP hearing, which made it impossible to examine Tryco's books to get an accurate accounting.  We do have Forms W-2 Tryco issued for the years 1993 and 1994, but they do not appear to reflect any of the bonuses that Tryco paid to the Dixons or any amounts withheld from those bonuses.

The problem of how much withholding there was is different from the questions of how much there should have been and whether the Dixons and Tryco can fix any underpayment years later the way they tried to.  To solve the problem of how much withholding there actually was, we turn first to the best evidence rule.  This is a rule of evidence that requires, with limited exceptions, production of an original document to prove its contents.  Fed. R. Evid. 1002.  Other evidence of its contents is admissible if all originals have been lost or destroyed (unless in bad faith) or if no original can be obtained through judicial process.  Fed. R. Evid. 1004.  Whether that other evidence correctly reflects the contents of the missing document is a question of fact.  Fed. R. Evid. 1008.

[*16] We find that the records in these cases, with a few exceptions, have all been lost.[7] Neither party was able to prove who lost the records or how they disappeared, and so we will not draw adverse inferences against either party. We do have several computer-generated payroll checks and handwritten bonus checks together with the check stubs, and documents from the criminal cases showing the calculations for the tax loss. We find that the checks, both payroll and bonus checks, show that income taxes were regularly withheld from the Dixons' compensation for all four years.[8]

The Commissioner claims that the final tax-loss figure was just a compromise, and that we should give it little weight in trying to figure out how much Tryco actually withheld from the Dixons' pay. But though we agree that the final tax-loss number may well have been a compromise, we find that there is nothing to suggest that the Dixons and their prosecution compromised on the

---

[7] The Dixons claim that during the criminal cases they handed over all the original records to the government, which then lost them. The Commissioner doesn't directly dispute this, but he claims that an experienced attorney like Campagna would never have turned over such important documents without making copies.

[8] The Commissioner does not assert in these cases that if the amounts were withheld, the credits should still be disallowed on other grounds. Cf. May v. Commissioner, 137 T.C. 147, 153 (2011), aff'd, 111 A.F.T.R. 2d (RIA) 2013-1126 (6th Cir. 2013).

**[*17]** amount Tryco had withheld. When a taxpayer is charged with failure to file, "the tax loss shall be treated as equal to 20% of the gross income (25% if the taxpayer is a corporation) *less any tax withheld or otherwise paid*, unless a more accurate determination of the tax loss can be made." U.S. Sentencing Guidelines Manual sec. 2T1.1(c)(2) (2002) (emphasis added). If there is any figure to be adjusted in this equation, therefore, it would be the "gross income" rather than the provable withheld taxes. We recognize that the computation of the tax losses in the Dixons' criminal cases are not binding in the civil case--the parties specifically agreed to that. But we find the testimony before us about how one component of those tax losses--the amounts actually withheld during the tax years at issue in the criminal cases--was arrived at to be credible. We specifically find that the amounts listed in the tax-loss computation as actually withheld were compiled from the then-still-extant books and records of Tryco. We thus find it more likely than not that Sharon and James each had actual income-tax withholdings as outlined supra p. 5 of this opinion: $13,033 for 1992, $49,779 for 1993, $123,013 for 1994, and $69,623 for 1995, for a grand total of $510,896 between both Dixons. They win on this point.